UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUCAS BAILLARGEON,

       Plaintiff,

                                       Case No. 1:21-cv-886

v.

                                       Hon. Hala Y. Jarbou

GRANT HUBER, et al.,

       Defendants.

_____/

## OPINION

Plaintiff Lucas Baillargeon brought this civil rights action against Michigan State Troopers Grant Huber, Adam Keasler, Joseph Read, and Aaron Damstra. The parties have dismissed Defendant Damstra. Before the Court is a motion for summary judgment by Defendants Huber, Keasler, and Read (ECF No. 66). Also before the Court is Plaintiff's motion for partial summary judgment (ECF No. 69). For the reasons herein, the Court will deny Plaintiff's motion and partially grant Defendants' motion.

## I. BACKGROUND

On April 26, 2020, when Huber was monitoring traffic on U.S. 31 near Muskegon, Michigan, two motorcycles drove past him traveling over 100 miles per hour, so he pulled onto the highway to pursue them. The driver of the second motorcycle slowed down and Huber passed him on his way to intercept the driver of the first motorcycle. The first motorcyclist accelerated and then evaded Huber. Huber called dispatch and gave them a description of that motorcycle. He then pulled over to the shoulder to wait for the second motorcycle. He waited a short time, but the second motorcycle did not appear, so Huber took a nearby exit off the highway. Huber eventually located the driver of the second motorcycle at an intersection in Muskegon.

The driver of the second motorcycle told Huber that the other motorcyclist was Baillargeon.  (Huber Dep. 23, ECF Nos. 66-3, 69-3.)  The driver said he had met Baillargeon at a bike rally and he showed Huber an image of Baillargeon's Facebook page, which had a photograph of a motorcycle.  (*Id.*)  Huber checked the registration plate of that motorcycle with state records and confirmed that it was registered to Baillargeon.  (*Id.*)

Huber informed other officers what had happened and then he, Keasler, Read, and Damstra went to Baillargeon's home in Sparta, Michigan, to investigate his involvement in the speeding incident.  After the officers arrived at Baillargeon's house, Huber walked up to the front porch while Keasler walked to a spot near the front of the garage to support Huber.  (*Id.* at 27; Keasler Dep. 16, ECF Nos. 66-7, 69-4.)  Meanwhile, Read headed toward one side of the house while Damstra headed toward the opposite side and then to the back of the house.  (Read Dep. 17, ECF Nos. 66-11, 69-5; Damstra Dep. 10, ECF No. 66-12.)

The parties offer different accounts of what happened next.

**A. Plaintiff's Account**

**1. Baillargeon**

Baillargeon had not driven his motorcycle that day.  He was at his home taking a nap when his sister-in-law called to tell him that the police were on their way to his house.  (Baillargeon Dep. 20, ECF No. 69-2.)  A few minutes later, the police arrived and Baillargeon went to his front door and opened it.  (*Id.* at 24.)  He then unlocked the screen door and moved to push it open, but Huber grabbed it out of his hand.  (*Id.*)  Huber then grabbed Baillargeon's left wrist and asked him if he was Lucas Baillargeon; Baillargeon confirmed that he was.  (*Id.* at 26-27, 30-31.)  Huber said to Baillargeon, "Get the fuck out of the house now."  (*Id.* at 31.)  Huber then tried to pull Baillargeon out of the house by his arm, but Baillargeon held onto his door and Huber's hands slipped off.  (*Id.* at 26, 31.)  Huber then lunged at Baillargeon to tackle him.  (*Id.* at 35.)  Huber

2

glanced off the doorframe and "bounced" into Baillargeon, but Baillargeon continued to hold onto his door.  (*Id.*)  Keasler then came in and grabbed Baillargeon by his shoulders.  (*Id.*)  A third officer came in and grabbed Baillargeon by his middle section.  (*Id.* at 36.)  A fourth officer entered, helped lift Baillargeon off the ground, and then slammed him onto and over the back of a couch.  (*Id.* at 36, 43.)  Three of the officers went over the back of the couch with Baillargeon.  (*Id.* at 53.)

Baillargeon landed on the couch cushions with his hands and arms in the air.  (*Id.* at 53.)  One of the officers pulled out his taser and threatened to use it on Baillargeon if he did not stop "resisting."  (*Id.* at 44.)  Baillargeon repeatedly said that he was not resisting.  (*Id.* at 43-44.)  And he did not assault any of the officers or make a fist with his hand.  (*Id.* at 44.)  The officers then tried to roll him over, but they were unable to do so because they attempted to roll him in two different directions at the same time.  (*Id.* at 45-46, 51.)  Baillargeon kept his hands in the air.  They finally rolled him over onto his stomach.  (*Id.* at 46, 51.)  At this point, his legs were draped over the back of the couch, his stomach was on the couch cushions, his upper chest was in the air, and his face was touching the floor.  (*Id.* at 46, 56.)  He voluntarily put his hands behind his back without resisting.  (*Id.* at 56-57.)  The officers handcuffed him in this position and then Huber pressed his knee into Baillargeon's shoulder blades and the back of his neck.  (*Id.* at 47, 49, 69.)  Meanwhile, Keasler pushed Baillargeon's face to the floor, knelt down, put his face against Baillargeon's, and said that he had come to "get" Baillargeon because Baillargeon was "a piece of shit[.]"  (*Id.* at 100-02.)

Baillargeon remained in that position, with Huber's knee on his back and neck, for five to ten minutes while the officers told his wife that they had come to their house because Baillargeon had been "running from the cops" on his motorcycle.  (*Id.* at 58, 69.)  Baillargeon told them that

3

his friend had borrowed his motorcycle.  (*Id.* at 58.)  The officers said they did not believe him, so they brought him out of the house and placed him in the back seat of a police vehicle.  (*Id.* at 60.)

Baillargeon sat in the police cruiser for about an hour until one of the officers took him to the county jail for booking on charges of resisting arrest and assaulting a police officer.  (*Id.* at 67, 85.)  He stayed at the county jail that night and was released the following afternoon after the prosecutor dismissed the charges against him.  (*Id.* at 70.)

Due to the force used on Baillargeon during his arrest, he contends that he sustained bruising and suffered back pain.  (*Id.* at 72.)

### 2. Baillargeon's Daughter

Baillargeon's daughter, Cyleste Baillargeon, lives with her parents.  She was at home when Defendants arrived to question her father.  (Cyleste Dep. 5-7, ECF No. 69-7.)  She was standing a few feet behind Baillargeon when he answered the door.  (*Id.* at 9.)  She then went upstairs to check on her child.  After she came back downstairs a few minutes later, she saw one or two officers "shoving" Baillargeon through the doorway.  (*Id.* at 11.)  Two officers "tackled" her father "over the couch."  (*Id.*)  Her father ended up on the floor, on his back.  (*Id.* at 15, 34-35.)  She saw Baillargeon "squirming," but she did not think he was resisting.  (*Id.* at 29.)

### 3. Baillargeon's Father-In-Law

Baillargeon's father-in-law, James Douglas, was also living with Baillargeon in April 2020.  (Douglas Dep. 9, ECF No. 69-8.)  He was not in the front living room when the police arrived so he could not see the front door from his location.  (*Id.* at 17.)  After hearing some yelling, he went to the front room to investigate.  He saw Baillargeon on his back on the floor with several officers "laying" on him.  (*Id.* at 21.)  Baillargeon was trying to push them off.  (*Id.* at 20.)

**B. Defendants' Accounts**

**1. Huber**

According to Huber, he opened a screen door at the front of Baillargeon's home and knocked on the main door behind it, holding the screen door open with his body. (Huber Dep. 32.) Baillargeon came to the door and opened it. (*Id.* at 17.) Huber asked Baillargeon his name and Baillargeon told him. (*Id.*) Huber asked Baillargeon to step out onto the front porch, but Baillargeon refused. (*Id.* at 26.) Baillargeon then tried to "slam" the door closed, but Huber lifted his left foot, made a "small stepping motion," and used the underside of his boot to stop the door from closing. (*Id.* at 29-31.) Huber did this because he did not want the door to "slam[] onto [his] person." (*Id.* at 29-30.)

Baillargeon then reached out, grabbed Huber by his uniform and microphone cord, and "made a fist" with his hand. (*Id.* at 47, 49, 52.) Huber responded by grabbing Baillargeon's arm. (*Id.* at 52.) Baillargeon, who weighed 250 pounds and was heavier than Huber (Baillargeon Dep. 15), pulled Huber a few feet into the house, into Baillargeon's front living room.

Huber told Baillargeon that he was under arrest and ordered him to stop resisting. (Huber Dep. 52.) Huber tried to perform an "arm-bar takedown" on Baillargeon, but he was not successful. (*Id.* at 53.) Keasler entered the house a moment later. Keasler and Baillargeon fell over the top of a couch and ended up on the floor, with Baillargeon on his stomach. (*Id.* at 58-59, 60.) Huber unholstered his taser but decided not to use it. (*Id.* at 60.) Around that time, Read and Damstra entered the room.

All four officers worked to subdue Baillargeon. While Baillargeon was on the floor, he would not comply with commands to put his hands behind his back. (*Id.* at 62.) Huber saw mucus bubbling out of Baillargeon's mouth and believed that Baillargeon was trying to spit on the officers. (*Id.* at 71.) Huber used his thumb and palm to apply pressure behind Baillargeon's jaw

in order to obtain compliance from Baillargeon.  (*Id.* at 59.)  Meanwhile, Keasler used his knee to apply pressure to the upper right side of Baillargeon's back in order to move Baillargeon's right arm and place it behind Baillargeon's back.  (*Id.* at 69.)  Keasler applied pressure for about 15 seconds and then stopped after Baillargeon's wrists were secured in handcuffs.  (*Id.*)

After the officers completed their arrest of Baillargeon, he told them that he had given his motorcycle to a friend.  (*Id.* at 73.)  He also showed them his location history on his cell phone, which indicated that he had not been in Muskegon County at the time of the motorcycle chase.

### 2. Keasler

From Keasler's position in front of the garage, he could see Huber's back while Huber was standing at the front door to Baillargeon's home.  (Keasler Dep. 22-23.)  Keasler heard them speaking to one another but could not make out their words.  (*Id.* at 23.)  It appeared to Keasler that Baillargeon was yelling at Huber.  He saw Huber lift his foot to stop Baillargeon from slamming the door closed.  (*Id.* at 25.)  Keasler lost sight of Huber as Huber went through the front door into Baillargeon's home.  (*Id.* at 26.)  Keasler then moved toward that door.  When he got closer, he saw Huber inside the house with Baillargeon's hands on Huber's chest and shoulder area.  (*Id.* at 28, 43.)  Keasler entered the house to assist and protect Huber because it appeared that Baillargeon, who was taller and larger than Huber, was assaulting Huber.  (*Id.* at 41, 43-44.)  Read entered the house shortly afterward.  (*Id.* at 43.)

Keasler, Read, and Huber struggled with Baillargeon and then the four of them toppled over the back of a couch.  (*Id.* at 49.)  Baillargeon ended up on the floor on his back.  (*Id.* at 50.)  Keasler was a foot or two from Baillargeon's face.  (*Id.* at 51.)  Baillargeon was yelling at the officers and saliva particles were flying out of his mouth.  (*Id.* at 50-51.)  Keasler pushed Baillargeon's chin up to prevent him from spitting on them.  (*Id.*)  The officers turned Baillargeon over onto his stomach to put handcuffs on him.  (*Id.* at 50.)  Keasler denies taunting Baillargeon.

### 3. Read

According to Read, he saw or heard Huber knock on the front door of Baillargeon's home just as Read was walking around the corner of the house to position himself at the side of the home. (Read Dep. 22.)  Read heard Huber ask Baillargeon's name but he could not hear the rest of their conversation.  (*Id.* at 24.)  Moments later, Read heard a "loud noise," "like a slam or a bang."  (*Id.*)  Read became concerned, so he ran back around to the front of the house.  (*Id.* at 27.)  Read saw Keasler head to the front door and enter the house shortly before Read did.  (*Id.*)  As Read entered, he saw Baillargeon and Huber "grabbing onto each other and shoving each other around."  (*Id.*)  Read grabbed one of Baillargeon's arms as Keasler grabbed the other one.  (*Id.* at 32.)  Baillargeon kept moving and pulling his arm.  (*Id.* at 36.)  While Baillargeon, Read, and Keasler struggled, the three of them toppled over the back of Baillargeon's couch.  (*Id.* at 45.)

Baillargeon was initially on his back against the couch but eventually he ended up on his stomach on the floor.  (*Id.* at 45, 50-51.)  Read grabbed Baillargeon's arm from under his body to help put Baillargeon in handcuffs because Baillargeon refused commands to put his arms behind his back.  (*Id.* at 50-51.)

### 4. Damstra

Damstra was at the side of Baillargeon's house when he heard a "struggle" or "commotion" inside or near the home.  (Damstra Dep. 16, 33.)  Damstra went back around to the front and entered the house because he was concerned for Huber's safety.  (*Id.* at 17.)  He saw Baillargeon struggling with the other three officers and heard the other officers telling Baillargeon to stop struggling and to put his hands behind his back.  (*Id.* at 19, 24.)  Within a second after Damstra's entry into the house, the other three officers toppled over the couch with Baillargeon.  (*Id.* at 25.)  Damstra briefly grabbed Baillargeon's ankles but then turned his attention elsewhere after he saw that Baillargeon was under control.  (*Id.* at 24.)

7

### C. Claims

Baillargeon's complaint asserts that Defendants' conduct violated his right under the Fourth Amendment to be free from unreasonable searches and seizures.  In particular, he contends that Defendants used excessive force and "falsely arrested and falsely detained [him] without probable cause."  (Compl. ¶¶ 24-25, ECF No. 1.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).  "This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

## III. QUALIFIED IMMUNITY

Defendants raise qualified immunity as a defense to liability.  Qualified immunity shields public officials "'from undue interference with their duties and from potentially disabling threats of liability.'"  *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 806 (1982)).  It "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Baillargeon bears the burden of showing that Defendants are not entitled to qualified immunity.  *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011).  To do so, he must show "(1) that [Defendants] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted).  "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."  *Id.*

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority.  It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that every reasonable official would know.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations and quotation marks omitted).  It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.  "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *Wesby*, 138 S. Ct. at 590.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*.  The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  This requires a high degree of specificity.  We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that

> he or she faced.  A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

*Id.* (citations and quotation marks omitted; emphasis added).  "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was [unlawful]."  *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

"When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.  [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

## IV. ANALYSIS

### A. Baillargeon's Motion – Unlawful Entry

Baillargeon seeks summary judgment on his claim that Defendants violated his rights under the Fourth Amendment by entering his home without a warrant, consent, or exigent circumstances. In particular, Baillargeon contends that it is undisputed that Huber put his foot inside the threshold of Baillargeon's home when he had no legal right to do so.  Similarly, Baillargeon contends that Defendants Keasler and Read, who entered the home shortly after Huber, had no right to enter Baillargeon's home.

"The 'chief evil' against which the Fourth Amendment protects is the 'physical entry of the home.'"  *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)).  The Fourth Amendment "generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Id.*  "The Fourth Amendment prohibition against entering a home without a warrant applies equally

10

whether the police enter a home to conduct a search or seizure or for some other purpose." *Id.* at 253.

There are a few exceptions to the warrant requirement.  One exception applies when there are "exigent circumstances," including the following situations:  "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others."  *Id.* (quoting *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)).

As an initial matter, Defendants argue that Baillargeon cannot assert an unlawful entry claim because he did not plead it in his complaint and did not give Defendants sufficient notice of this claim.  In the section of Baillargeon's complaint devoted to describing the Fourth Amendment violations, Baillargeon asserts that Defendants "used excessive force in the arrest of Plaintiff," "falsely arrested and falsely detained Plaintiff without probable cause," and "falsely arrested/detained/seized Plaintiff without considering the totality of the circumstances."  (Compl. ¶¶ 24-26.)  This section of the complaint does not expressly assert that Defendants entered his home in violation of his Fourth Amendment rights.

On the other hand, in the complaint's general summary of the facts, Baillargeon alleges that Defendants entered his home "without his permission" and arrested him while they were "unlawfully inside of [his] home."  (Compl. ¶¶ 14-15.)  These allegations allude to an unlawful entry claim.  Moreover, when conducting discovery depositions, Baillargeon's counsel repeatedly questioned Defendants about the legal basis for their entry into Baillargeon's home, i.e., whether there was a warrant, consent, or the presence of exigent circumstances.  (*See, e.g.*, Huber Dep. 15-16, 35, 49-51; Keasler Dep. 15, 18-19; Read Dep. 10, 12, 15-16, 61; Damstra Dep. 12-14, 16-17.)  Some of these questions focused on whether Huber had a "right" to put his foot into Baillargeon's

home.  (*See* Huber Dep. 34.)  Further, Baillargeon has moved for summary judgment on the issue and Defendants have had an opportunity to respond.

In similar circumstances, the Court of Appeals has concluded that defendants were on notice of a type of Fourth Amendment claim even though the complaint did not expressly identify the theory for that claim.  *See, e.g.*, *Cummings v. City of Akron*, 418 F.3d 676, 681-82 (6th Cir. 2005) (parties briefed the unlawful entry claim at summary judgment); *Thacker*, 328 F.3d at 252 (parties conducted discovery on the unlawful entry claim); *Denton v. Rievley*, 353 F. App'x 1, 7 (6th Cir. 2009) (complaint asserting unlawful entry was adequate to allege an unlawful search where the complaint "included statements regarding the district court's jurisdiction, [the plaintiff's] entitlement to relief, and a demand for such relief"); *see also Vencor, Inc. v. Standard Life & Acc. Ins. Co.*, 317 F.3d 629, 641 n.11 (6th Cir. 2003) (raising the issue in response to the defendant's motion for summary judgment was sufficient to avoid waiving a claim); *Moore v. City of Harriman*, 272 F.3d 769, 774 (6th Cir. 2001) (noting that "[s]ubsequent filings in a case may rectify deficiencies in the initial pleadings" where the plaintiff first raised the issue in response to a motion to dismiss).  As in those cases, the Court concludes that Defendants received sufficient notice of Baillargeon's unlawful entry claim.

Defendants also argue that they will be prejudiced if the Court allows Baillargeon to assert this "new claim" of unlawful entry because discovery in this matter has closed.  However, Defendants do not indicate what additional discovery would be necessary.  Indeed, Defendants are already aware of what actions they took when they were at Baillargeon's home.  Accordingly, the Court rejects Defendants' argument that Baillargeon cannot assert an unlawful entry claim.

Regarding the merits of Baillargeon's claim, Defendants respond that they had a right to enter Baillargeon's home without a warrant.  Defendants also assert that they are entitled to qualified immunity.[1]

### 1. Huber's Foot in the Doorway

In his motion for partial summary judgment, Baillargeon focuses on Huber's testimony that he put his foot out to stop Baillargeon from closing his door.  Huber acknowledges that he put his foot "within the door jamb" to stop the door from closing.  (Huber Dep. 32.)  Thus, it is undisputed by Defendants that Huber's foot crossed the threshold into Baillargeon's home by some small amount after Baillargeon attempted to close the door.[2]  Baillargeon argues that this intrusion was unlawful.

"The 'knock and talk' . . . rule allows an officer without a warrant to enter the curtilage [of a home] and knock on the front door in an attempt to speak with the occupants[.]"  *Watson v. Pearson*, 928 F.3d 507, 512 (6th Cir. 2019).  But "the Fourth Amendment has drawn a firm line at the entrance to the house."  *Payton*, 445 U.S. at 590.  "If the government wants inside, they need a warrant, consent, or an exigent circumstance to justify their entry."  *Brenay v. Schartow*, 709 F. App'x 331, 333-34 (6th Cir. 2017).  "[W]ith regard to the home, there is no *de minimis* exception to the Fourth Amendment."  *Smith v. City of Wyoming*, 821 F.3d 697, 714 (6th Cir. 2016) (citing *Kyllo v. United States*, 533 U.S. 27, 37 (2001)).  "[A]n unauthorized intrusion only inches inside

---

[1] Defendants raised qualified immunity as an affirmative defense in their answer to the complaint.  (Answer, ECF No. 12, PageID.36.)  In addition, Read and Keasler raised the issue of qualified immunity in response to Baillargeon's motion for partial summary judgment, citing *Mullins v. Cyranek*, 505 F.3d 760 (6th Cir. 2015).  (Defs.' Resp. Br. 7, ECF No. 74.)  And all Defendants have asserted qualified immunity in support of their own motion for summary judgment.  (Defs.' Mot. for Summ. J. 12, ECF No. 66.)

[2] Baillargeon denies closing the door on Huber (Baillargeon Dep. 27), but he does not dispute Huber's assertion regarding the placement of Huber's foot.

a home is 'an actual intrusion into a constitutionally protected area.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)).

Huber argues that he had probable cause to arrest Baillargeon and could enter Baillargeon's house to make that arrest once Baillargeon appeared in the threshold of the door to his home. Huber relies upon *United States v. Santana*, 427 U.S. 38 (1976), in which the Supreme Court held that "a suspect may not defeat an arrest which has been set in motion in a public place" by "retreating into her house[.]" *Santana*, 427 U.S. at 42.  There, the police first spotted the suspect from the street when she was "standing in the doorway of [her] house," "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 40, 42.  When the police approached her, she fled into her house. *Id.* at 40.  The Court concluded that the officers could legally follow her into the house because "a suspect may not defeat an arrest by simply running inside." *Brenay*, 709 F. App'x at 334.  This is known as the "hot pursuit exception" to the warrant requirement. *Smith v. Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013).  It applies only when the "officer initiates an arrest in a public place, but the suspect flees into a private one[.]" *Brenay*, 709 F. App'x at 334.

The hot pursuit exception does not apply here because, construing the evidence in Baillargeon's favor, there is no evidence from which to infer that Huber initiated an arrest before he crossed the threshold of Baillargeon's home with his foot.  According to Huber's deposition testimony, he did not tell Baillargeon that he was under arrest or take any other action to arrest Baillargeon until *after* Baillargeon tried to close the door on him.  (Huber Dep. 50.)  It is clearly established that an officer cannot initiate a warrantless arrest and then reach into a home to grab a suspect *after* the suspect has already retreated inside or ended their consensual encounter with the

14

police by closing their door.  *Brenay*, 709 F. App'x at 335.  "Unless and until [Huber] initiated an arrest, [Baillargeon was] free to shut the door and walk away."  *Id.*

Huber also relies upon *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), in which an officer stepped into the defendant's doorway to initiate an arrest by grabbing the defendant.  *Id.* at 297.  While doing so, the officer "took a quick glimpse inside" the defendant's apartment.  *Id.* at 293.  During that glimpse, the officer saw what appeared to be narcotics.  The defendant argued that the glimpse was an improper search under the Fourth Amendment and the Court of Appeals agreed.  That decision does not provide guidance here because the court did not examine the officer's physical intrusion into the defendant's home.  Moreover, the officer in that case possessed a warrant to make his arrest, which is something that Huber did not possess.  "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  *Payton*, 445 U.S. at 603.

The same fact distinguishes *United States v. Kinney*, 638 F.2d 941 (6th Cir. 1981), in which police officers arrested the defendant in the doorway of his home by grabbing his arm and pulling him outside.  *Id.* at 943.  Unlike Huber, the officers in *Kinney* possessed a warrant to arrest the defendant.  *Id.* at 942.  Accordingly, they could reach into the defendant's home to make the arrest without running afoul of the Fourth Amendment.

Furthermore, this case is not like *Allen v. City of Ecorse*, No. 21-1268, 2021 WL 5320446 (6th Cir. Nov. 16, 2021), in which the Court of Appeals determined that officers were justified in entering a home without a warrant to arrest a fleeing suspect under the "hot pursuit" exception.  *Id.* at *1.  There, the officers chased an individual who was suspected of involvement in a drug transaction.  *Id.* at *1-2.  The suspect fled from the police on his moped, disregarding traffic signals

15

and the officers' emergency lights.  *Id.* at *1.  After the suspect crashed his moped, he continued

his flight on foot.  An officer got out of his vehicle to follow him, but quickly lost sight of him.

Soon after, another officer reported that he saw the suspect run into a house nearby.  The officers

then went to that house and forced their way inside to make an arrest.  *Id.*

Unlike the officers in *Allen*, Defendants were not engaged in the hot pursuit of a fleeing

suspect.  By the time that Defendants learned Baillargeon's identity, there was no ongoing chase

and there was no emergency.  Defendants knew the identity of their suspect and could have

obtained a warrant to arrest him.  "The 'hot pursuit' exception is reserved for situations where

speed is essential to protect a compelling governmental interest."  *United States v. Morgan*, 743

F.2d 1158, 1162 (6th Cir. 1984); *see Grant v. Wilson*, Nos. 21-5642/5750, 2022 WL 3500190, at

*7 (6th Cir. Aug. 8, 2022) ("We have repeatedly held that a hot pursuit must involve an emergency

situation and an imminent pursuit.").  Indeed, Huber has acknowledged that, when he approached

the door, there were no exigent circumstances requiring immediate entry into Baillargeon's home.

(Huber Dep. 16; *see also* Read Dep. 10.)

To the extent Huber argues that he had probable cause to arrest Baillargeon for fleeing and

eluding a police officer on his motorcycle, or for "assaulting" Huber by closing the door on him

(Defs.' Br. in Supp. of Mot. for Summ. J. 17, ECF No. 66), probable cause alone did not give

Huber the authority to cross the threshold into Baillargeon's home to make an arrest.  *See Watson

v. City of Burton*, 764 F. App'x 539, 542 (6th Cir. 2019) ("Absent exigent circumstances, that

threshold may not reasonably be crossed without a warrant." (quoting *Payton*, 445 U.S. at 590)).

The Court of Appeals has "presumed that a person who is near, but interior to, his doorway is

entitled to the benefit of *Payton*'s 'threshold' rule."  *United States v. Corder*, 724 F. App'x 394,

402 (6th Cir. 2018).

On the other hand, this case is similar to *Smith v. City of Wyoming*, 821 F.3d 697 (6th Cir. 2016), in which an officer conducted a "knock and talk" interview at the plaintiff's doorway.  *Id.* at 713.  As the plaintiff tried to shut the door, the officer "placed his foot in the doorway, briefly preventing her from closing it."  *Id.*   The Court of Appeals held that it was not clearly established that "preventing the closure of the door to a home to briefly extend a consensual interview violates the Constitution."  *Id.* at 714.  The court found "only one . . . analogous case," *Dalcour v. City of Lakewood*, 492 F. App'x 924 (10th Cir. 2012), but that case was distinguishable because the officer in *Dalcour* "kept her foot in the doorway of a home despite the occupant repeatedly attempting to slam the door shut, long enough for reinforcements to arrive."  *Smith*, 821 F.3d at 714.  The court in *Smith* declined to decide whether the defendant had violated the Fourth Amendment and then granted the defendant qualified immunity.  *Id.*

As in *Smith*, Huber did not keep his foot in the door despite repeated attempts by Baillargeon to end their consensual encounter.  Instead, Huber lifted his foot up and briefly crossed the threshold to Baillargeon's home to stop the door from closing on only one occasion. Baillargeon cites no case law clearly establishing that this particular conduct was unlawful. Instead, he relies on cases asserting the general principle that crossing the threshold into the home is an entry subject to the Fourth Amendment.  *See Payton*, 445 U.S. at 589-90; *Watson*, 764 F. App'x at 542 (discussing *Payton*).  But that principle defines the law at too high a level of generality.  If that principle determined what was clearly established, then the result in *Smith* would have been different.  Because Baillargeon has not satisfied his burden of overcoming qualified immunity, he is not entitled to summary judgment for this claim.[3]

---

[3] Huber did not move for summary judgment on the aspect of Baillargeon's unlawful entry claim involving Huber's foot, so the Court will not grant summary judgment in Huber's favor.

### 2. Keasler and Read's Entry into the Home

Baillargeon argues that he is entitled to summary judgment for his claim that Keasler and Read unlawfully entered his home.  Baillargeon acknowledges that both Keasler and Read testified that they entered the home after seeing or hearing Baillargeon and Huber physically struggling with one another.  For instance, Keasler testified that he thought Huber was assaulting Baillargeon.  And Read testified that he saw Huber and Baillargeon grabbing and shoving one another.

As Defendants indicate, police officers may enter a home without a warrant in order to "protect an occupant from imminent injury." *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)).  In such circumstances, officers "do not need ironclad proof of a likely serious, life-threatening injury[.]" *Id.* (quoting *Fisher*, 558 U.S. at 49) (internal quotation marks omitted).  Nor do they "need to wait for a potentially dangerous situation to escalate into public violence in order to intervene." *Id.*  Instead, their entry "must be based on an objectively reasonable belief, given the information available at the time of entry, that a person within the house was 'in need of immediate aid.'" *Id.* (quoting *Fisher*, 558 U.S. at 47).  "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006).  "Thus, exigent circumstances may exist when 'the suspect represent[s] an immediate threat to the arresting officers and public[.]'" *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (quoting *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992)).  "The circumstances must be viewed objectively, and the officer's subjective intent in entering the home is irrelevant." *Crabbs v. Pitts*, 817 F. App'x 208, 214 (6th Cir. 2020).

Construing the evidence in favor of Defendants Keasler and Read, they had reason to believe that Huber needed protection from assaultive behavior by Baillargeon.  Consequently, they had reasonable grounds for entering the home to protect Huber from injury.

Baillargeon responds that Defendants' actions were unreasonable because he had a right to resist Huber's unlawful entry and arrest under Michigan law. *See People v. Moreno*, 814 N.W.2d 624, 628 (Mich. 2012) ("[T]he right to resist unlawful arrests, and other unlawful invasions of private rights, is well established in our state's common law."). Thus, to the extent Keasler and Read saw Baillargeon struggling with Huber, Baillargeon argues that his actions were legally justified. That justification, he argues, deprived Keasler and Read of the right to enter his home to intervene.

Baillargeon is correct that Michigan courts recognize a common law right to resist unlawful arrests and unlawful entries, but he is mistaken in its application to this case. Importantly, the right to resist is a defense to a charge of resisting and obstructing a police officer. *See Moreno*, 814 N.W.2d at 629. To prove that a defendant committed such an offense, the state must prove that the officer's actions were lawful. *People v. White*, 871 N.W.2d 716, 717 (Mich. 2015) (McCormack, J., concurring). But that common law right does not determine whether the Fourth Amendment permitted Defendants to enter Baillargeon's home in order to come to the aid of Huber. The Fourth Amendment looks to the reasonableness of the officers' actions in light of the facts known to them at the time. As a general matter, police officers cannot be expected to determine, in the heat of the moment, whether an individual is lawfully resisting an unlawful arrest. Instead, their overriding duty is to restore order and prevent harm.

Moreover, in this particular case, when construing the evidence in favor of Keasler and Read, they would not have been aware that Huber's entry into the home or attempted arrest were unlawful. There is no evidence that they were aware of all the details of the interaction between Baillargeon and Huber or the reason for Huber's entry into the home. Keasler was standing some distance away from Huber. He saw Huber lift his foot to stop Baillargeon's door from closing, but

19

he could not make out the words between Huber and Baillargeon.  Read was even farther removed from Huber's interaction with Baillargeon.  Read lost sight of Huber after rounding the side of the house.  After Huber disappeared into the home, Keasler and Read moved toward the front door. After arriving, they saw Huber struggling with a larger individual who was pushing and/or grabbing Huber.  In those circumstances, it would have been reasonable for Keasler and Read to enter the home to assist Huber in making an arrest or to protect Huber from harm.

Baillargeon claims that Huber was the aggressor and that Baillargeon did not resist any efforts by Huber to arrest him.  If that is true, it is possible that Huber entered Baillargeon's home unlawfully and did not need assistance from Keasler or Read.   Nevertheless, even in those circumstances, Keasler and Read could enter the home to quell the situation by ensuring that Huber did not injure Baillargeon.  Either way, Keasler and Read's entry into the home was reasonable. Thus, Baillargeon is not entitled to summary judgment for this claim.

In short, the Court will deny Baillargeon's motion for summary judgment.

**B. Defendants' Motion**

### 1. Huber's Entry into Baillargeon's Home

Huber argues that he could lawfully arrest Baillargeon in the doorway to Baillargeon's home because he had personally witnessed a felony and he had probable cause to believe that Baillargeon was the suspect.  In other words, Huber saw a motorcyclist fleeing and eluding the police, which is a fourth-degree felony under Mich. Comp. Laws § 750.479a(1), and statements from the driver of the other motorcycle gave Huber reason to believe that Baillargeon was the fleeing motorcyclist.  In addition, Huber contends that he had probable cause to arrest Baillargeon for attempting to assault Huber by closing the door on him.

Huber argues that a warrant is not necessary when arresting a suspect in an open doorway, citing *Archibald*, *Kinney*, *Santana*, and *Allen*.  However, there is no doorway exception to the

warrant requirement.  *See United States v. Bradley*, 922 F.2d 1290, 1295 (6th Cir. 1991) (warrantless arrest at suspect's doorway was unlawful where exigent circumstances were not present); *Watson v. City of Burton*, 764 F. App'x 539, 543 (6th Cir. 2019) (concluding that it was clearly established that an officer could not reach across the threshold into a plaintiff's apartment to make a warrantless arrest at the plaintiff's doorway).  Indeed, an individual does not sacrifice their Fourth Amendment rights by appearing at their doorway to speak with police officers.  *See Kentucky v. Irving*, 563 U.S. 452, 469 (2011) ("[E]ven if an occupant chooses to open the door and speak with . . . officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.").

Furthermore, as discussed above, the cases cited by Defendants are distinguishable.  In *Santana* and *Allen*, there were exigent circumstances present; the officers were in "hot pursuit" of a fleeing suspect, which was not the case here.  In *Archibald* and *Kinney*, the officers possessed a warrant to make the arrest.  Huber did not possess a warrant to arrest Baillargeon.  And construing the evidence in Baillargeon's favor, no circumstances were present that would have justified Huber's actions.  Although Baillargeon was standing in his doorway, the Fourth Amendment did not permit Huber to reach into Baillargeon's home, grab his arm, and attempt to pull him outside.

Huber argues that he is entitled to qualified immunity because state law permitted him to make a warrantless arrest for a felony committed in his presence.  *See* Mich. Comp. Laws § 764.15(1)(a).  However, that statute does not supersede the Fourth Amendment.  Indeed, when discussing statutes like that one, the Supreme Court held that the Fourth Amendment permits warrantless arrests for all types of offenses made in the officer's presence, no matter how minor the offense, so long as the arrest is supported by probable cause.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  At the same time, however, the Court also indicated that arrests made

in an "extraordinary manner," such as a warrantless entry into the home, would require something more.  *Id.*  Similarly, in *Payton*, the Supreme Court noted that "the reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home."  *Payton*, 445 U.S. at 576; *accord Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).  And following *Payton*, the Supreme Court clarified that probable cause to believe an offense has been committed does not, by itself, suffice to create exigent circumstances to justify a warrantless entry into a home.  *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); *see Kirk*, 536 U.S. at 638 ("As *Payton* makes plain, police officers need either a warrant *or probable cause plus exigent circumstances* in order to make a lawful entry into a home." (emphasis added)).  Together, these cases support the "long established" rule that "an officer may not enter a home absent a warrant or an exception to the warrant requirement."  *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020).  Thus, while the commission of an offense in the presence of an officer may provide probable cause to make an arrest, it does not suffice to permit a warrantless entry into a home.

Defendants cite *Nance v. Kilpatrick*, No. 1:18-CV-11-TAV-CHS, 2019 WL 1409847 (E.D. Mich. Mar. 28, 2019), in which a district court for the Eastern District of Michigan granted summary judgment to an officer who arrested the plaintiff inside the door of his home.  There, the officer spoke to the plaintiff at the plaintiff's front door when responding to a "shots fired" call.  *Id.* at *2.  During the officer's encounter with the plaintiff, the officer believed that the plaintiff might be reaching for a weapon, so the officer leaned across the threshold of the doorway to "retain his visual."  *Id.*  At that point, the plaintiff slammed the door on the officer.  The officer responded by blocking the door with his foot.  Believing that the plaintiff had assaulted him, the officer entered the plaintiff's home to arrest him.  *Id.*  The court concluded that a reasonable officer in the defendant's situation could believe that he was entitled to arrest the plaintiff under the "hot pursuit"

doctrine in *Santana* because the plaintiff had committed an offense (i.e., assault) in an open doorway, which was a "public space." *Id.* at *8-9. The officer could then pursue the plaintiff into his home to make an arrest for that assault.

The Court is not persuaded that closing a door on an officer's foot gives rise to exigent circumstances to justify a warrantless entry into a home, but even if it does, Baillargeon denies closing the door on Huber. Accordingly, *Nance* is distinguishable because there is a genuine dispute of fact about whether the doorway assault even occurred.

Defendants also suggest that Baillargeon's failure to obey Huber's order to come out of the house gave Huber an additional reason to arrest Baillargeon. Defendants contend that Huber could lawfully order Baillargeon out of his home, and that Baillargeon's refusal to comply amounted to a felony of resisting or obstructing a police officer under Mich. Comp. Laws § 750.81d. However, Defendants provide no authority for their assertion that an officer can lawfully order an individual to step out of their home without a warrant for their arrest. Indeed, "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do." *King*, 563 U.S. at 469. Moreover, "the occupant has no obligation to open the door or to speak." *Id.* at 469-70. "And even if an occupant chooses to open the door and speak with the officers, the occupant . . . may refuse to answer any questions at any time." *Id.* at 470. If Huber could not force Baillargeon to open his door or to speak and could not arrest him inside his home without a warrant or exigent circumstances, it follows that he could not lawfully require Baillargeon to step outside his house. That being the case, Baillargeon did not resist or obstruct an officer when refusing to comply with Huber's command because that command was not lawful. *See* Mich. Comp. Laws § 750.81d(7)(a) (defining "obstruct" as a "knowing failure to comply with a *lawful* command") (emphasis added).

To be sure, if Baillargeon reached out and grabbed Huber, as Huber contends, then Huber could attempt to subdue Baillargeon in order to protect himself.  And that effort might have required Huber to enter Baillargeon's home.  But because Baillargeon denies grabbing Huber, those facts are disputed.  At this stage, the Court must view the evidence in light of Baillargeon's testimony that *Huber* grabbed Baillargeon, attempted to pull Baillargeon outside, and then tried to tackle Baillargeon inside his home.  The Court must also accept Baillargeon's testimony that he did not close the door on Huber.  Under these facts, there were no exigent circumstances permitting entry into Huber's home.  Furthermore, the law was clearly established that, absent exigent circumstances or an exception to the warrant requirement, Huber could not breach the threshold of Baillargeon's home to attempt to arrest Baillargeon.  Thus, to the extent Huber entered Baillargeon's home with his arm or the rest of his body, Huber is not entitled to qualified immunity for Baillargeon's unlawful entry claim.

### 2. Keasler and Read's Entry into Baillargeon's Home

Defendants argue that Keasler and Read could enter Baillargeon's home in order to assist or protect Huber.  As discussed, there is a genuine dispute of fact about what occurred in the interaction between Huber and Baillargeon.  But the relevant issue for Baillargeon's claim against Keasler and Read is what they each knew about the situation before entering Baillargeon's home.  In other words, did they each have an "objectively reasonable basis for believing" that their assistance was necessary to assist Huber or to prevent harm to others?  *Fisher*, 558 U.S. at 49 (quoting *Brigham City*, 547 U.S. at 406).  Keasler and Read claim that they saw Baillargeon grabbing Huber, whereas Baillargeon claims that Huber tried to pull him outside and then tackled him while he was simply holding onto his door.  Construing the evidence in Baillargeon's favor, it is possible that, from his vantage point, Keasler saw Huber grab Baillargeon and then tackle him

without a lawful basis for arresting Baillargeon or entering his home.[4]  Even so, as the Court

discussed above, Keasler and Read could enter the home to quell the physical altercation between

Huber and Baillargeon under the exigent circumstances exception to the warrant requirement.

Baillargeon provides no authority that would have made it clear to Keasler and Read that entering

Baillargeon's home to respond to the circumstances they faced violated his rights under the Fourth

Amendment.  Thus, at the very least, Keasler and Read are entitled to qualified immunity for any

unlawful entry into Baillargeon's home.

### 3. Excessive Force

Baillargeon claims that Defendants used excessive force on him when attempting to arrest

him.   "A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force."

*Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Gambrel v. Knox Cnty.*, 25

F.4th 391, 400 (6th Cir. 2022)).  "In deciding whether the force used was excessive, [the Court]

balance[s] the government's interests in protecting others (including the police) and curbing crime

against a suspect's right to not [] be injured." *Id.*

> Three factors are particularly relevant: (1) "the severity of the crime at issue,"
> (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or
> others," and (3) "whether he [wa]s actively resisting arrest or attempting to evade
> arrest by flight."

*Id.* at 1094 (quoting *Graham v. Conner*, 490 U.S. 386, 396 (1989)).  "These factors are not an

exhaustive list because the ultimate question is whether the totality of the circumstances justifies

[the] particular sort of seizure that took place."  *LaPlante v. City of Battle Creek*, 30 F.4th 572,

579 (6th Cir. 2022) (citation and internal quotation marks omitted).

> An officer's use of force must be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of hindsight, given the fact that police

---

[4] In contrast, Read testified that he could not see the doorway to Baillargeon's home during the initial interaction
between Baillargeon and Huber and there is no evidence disputing his testimony.  Thus, Read would not have known
whether Huber lawfully entered Baillargeon's home.

officers are often forced to make split-second judgments—in circumstances that are
tense, uncertain, and rapidly evolving—about the amount of force that is necessary
in a particular situation.

*Id.* (quotation marks omitted).

Here, only one of the three factors described above—the severity of Baillargeon's apparent
criminal conduct—arguably tilts in Defendants' favor.  After Defendants confirmed Baillargeon's
identity, they had reason to believe that he had driven a motorcycle at a dangerously high speed
and then intentionally fled from the police.  That conduct was somewhat serious in that it put other
members of the public at risk and provoked an "escalated confrontation" with the pursuing officer.
*See United States v. Martin*, 378 F.3d 578, 582 (6th Cir. 2004) (considering the seriousness of a
fleeing-and-eluding conviction for sentencing purposes).

The Court cannot assess the other two factors—the immediate threat that Baillargeon posed
and the level of his resistance he exerted—because the relevant facts are disputed.  In Baillargeon's
telling, he did not grab Huber, make a threatening gesture with his hand, or actively resist an arrest.
Instead, Huber grabbed and tackled him and then Huber and the other Defendants threw him over
the back of a couch while he was simply standing in his doorway, holding his door.  Once on the
couch, Baillargeon held his hands in the air.  He then voluntarily put his hands behind his back.
After Defendants secured him in handcuffs, Keasler pushed Baillargeon's face into the floor and
Huber pressed his knee into Baillargeon's neck and back for several minutes.  Defendants dispute
these assertions and support their motion with their own version of the facts, but the Court cannot
resolve the parties' factual disputes at this stage.  Construing the evidence in Baillargeon's favor,
Defendants' uses of force were not reasonable or necessary under the circumstances.

To the extent Defendants raise the defense of qualified immunity, it was clearly established
that they could not use a takedown maneuver on a passively resisting, non-threatening subject.  *See*
*McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (finding it clearly established that using

26

a takedown maneuver "on a non-resistant or passively-resistant individual may constitute excessive force"); *accord Sevenski v. Artfitch*, Nos. 21-1391/1402, 2022 WL 2826818, at *6 (6th Cir. July 20, 2022)  (citing *McCaig* and noting that "our court has repeatedly held that the use of force on a suspect who poses no serious threat to law enforcement can be excessive").  In addition, it was clearly established that Defendants could not kneel on or apply pressure to a subdued subject who posed no immediate threat.  *See In re Kulpa v. Cantea*, 708 F. App'x 846, 853 (6th Cir. 2017) (finding it clearly established that "driving heavy pressure into a prone, handcuffed, incapacitated detainee's back was constitutionally impermissible because it posed a serious risk of asphyxiation to the arrestee and was unnecessary to protect the officers"); *Laury v. Rodriguez*, 659 F. App'x 837, 845-47 (6th Cir. 2016) (affirming denial of qualified immunity to officers who knelt on the plaintiff's back or pushed his head into the ground after he was secured in handcuffs and was not resisting).

For the foregoing reasons, Defendants are not entitled to summary judgment for Baillargeon's excessive force claims against them.

### 4. False Arrest

Finally, Baillargeon claims that Defendants arrested him without probable cause. "Individuals generally have the right to be free from arrest without probable cause." *Harris v. City of Saginaw*, 62 F.4th 1028, 1033 (6th Cir. 2023).  "A probable cause determination must rest on 'reasonably reliable information that the suspect has committed a crime,' based on 'the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence.'"  *Id.* at 1033 (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008)).  The Court considers whether "a reasonable officer could have believed there was a 'fair probability' that [the arrestee] had committed a crime." *Id.* at 1033-34 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

27

Baillargeon argues that his false arrest claim is based on the "initial seizure" that occurred when Huber purportedly grabbed him by his left arm and attempted to pull him out of the house, followed by Keasler and Read's entry into his home to complete that arrest. (*See* Pl.'s Resp. Br. 15-16, 18, ECF No. 76; Baillargeon Dep. 26.)  He contends that Defendants lacked probable cause at the time of that initial seizure. (*Id.* at 18.)

On the contrary, when that initial seizure occurred, Defendants had probable cause to believe that a person with Baillargeon's name and address was the speeding motorcyclist who fled from the police.  It is undisputed that Huber had witnessed that offense and the other motorcycle driver who was present had identified Baillargeon as the suspect.  That driver's story was consistent with Baillargeon's Facebook account and with his vehicle registration records, which showed that Baillargeon owned a motorcycle.  In addition, Baillargeon had confirmed his identity to Huber.  The foregoing information was sufficient to establish a fair probability that Baillargeon had committed a felony under Michigan law.

Baillargeon argues that Defendants did not have probable cause to arrest him because he was not, in fact, the fleeing motorcyclist Huber had seen earlier that day.  However, probable cause does not require certainty. *See Hill v. California*, 401 U.S. 797, 803 (1971).  Armed with probable cause to believe that Baillargeon had committed a felony, any mistake by Huber or the other Defendants in arresting Baillargeon instead of the true culprit does not suffice to support a false arrest claim.  Accordingly, Defendants are entitled to summary judgment for this claim.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Baillargeon's motion for partial summary judgment.  The Court will grant Defendants' motion for summary judgment in part.  Defendants Huber, Keasler, and Read are entitled to summary judgment for Baillargeon's false arrest claim. Defendants Keasler and Read are entitled to summary judgment for Baillargeon's claim that they

unlawfully entered his home.  In all other respects, the Court will deny the motion.  The following claims remain pending:  (1) Defendant Huber unlawfully entered Baillargeon's home with his foot and then the rest of his body; and (2) Defendants Huber, Keasler, and Read used excessive force on Baillargeon.

The Court will enter an order consistent with this Opinion.


Dated: June 23, 2023                                         /s/ Hala Y. Jarbou
                                                              HALA Y. JARBOU
                                                              CHIEF UNITED STATES DISTRICT JUDGE